IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| FLEET MANAGEMENT LTD., ET AL. | : | NO. 07-279 |

**MEMORANDUM**

Padova, J.                                                                                    May 7, 2008

Currently before the Court are the Motion in Limine to Exclude Statements Taken by Government filed by Defendant Fleet Management Ltd ("Fleet"), the Motion in Limine on Behalf of Dyachenko to Suppress Certain Statements, Defendant Parag Rag Grewal's two Motions in Limine to Exclude Statements Taken by Government, and "Defendants' Joint Motion in Limine to Exclude Out-of-Court Statements by Dhabal and Gopal Singh and In-Court Testimony of Gopal Singh."

The statements at issue in the five Motions in Limine are primarily those memorialized in written reports of various Government agents based on interviews with crew members of the Valparaiso Star (the "Ship") during a Port State Control Inspection on January 24-25, 2007. In its Motions, Fleet seeks to exclude statements made by Motorman Thakorbhai Sailor, Third Engineer Pooran Singh, Second Engineer Alokesh Dhabal, Chief Engineer Yevchen Dyachenko, Captain Parag Rag Grewal, and Motorman Gopal Singh to federal agents on January 24, 2007.[1] Meanwhile, in their individual motions, Defendants Dyachenko and Grewal seek to suppress their own statements made to federal agents on board the Ship on January 24, 2007, and Defendant Grewal seeks to exclude

---

[1] Fleet's Motion in Limine to Exclude Statements Taken by Government also sought to suppress the statements of Third Engineer Rakesh Sharma and Motorman Suresh Vrayan. However, at a hearing held on January 31, 2008, Fleet stated that these statements were no longer at issue given our January 25, 2008 Order denying the Government's Motion to Amend its October 3, 2007 Notice Regarding Admissions Made by Fleet insofar as the Motion sought to add the statements of Sharma and Vrayan. (N.T. 1/31/08, at 52-53.)

additional statements that he made to an agent on the Ship on January 25, 2007.

Defendants' asserted bases for exclusion are that their Fifth Amendment rights were violated because no <u>Miranda</u> warnings were given, and that the use of the statements at trial would violate their right to due process under the Fourteenth Amendment.  Fleet, however, does not have standing to assert the Fifth Amendment rights of the crew members,[2] and thus, its arguments are limited to those under the Fourteenth Amendment.  We held evidentiary hearings on the Motions on January 30-31 and April 30, 2008, and held oral argument on March 10, 2008.  For the following reasons, we find that there is no basis to suppress any of the statements at issue or to exclude Gopal Singh's in-court testimony either pursuant to due process protections or under the Fifth Amendment.

**I.    BACKGROUND**

Based on the record developed at the evidentiary hearings, we find the following facts.  On January 24, 2007, Customs and Border Protection ("CBP") Officer Ivan Lebron was called to the Tioga Marine Terminal in Philadelphia to follow up on a report of either a ship deserter or someone seeking asylum.  (N.T. 1/31/08, at 20.)  Lebron and two of his colleagues met with a crew member of the Ship, Motorman Gopal Singh.  (<u>Id.</u> at 22, 29.)  Singh told Lebron and his colleagues that he was being discharged from the Ship for refusing to follow an order from the Chief Engineer to discharge waste oil overboard through a hose currently located underneath the deck plates in the engine room and that, in fact, others had discharged waste overboard.  (<u>Id.</u> at 22; Hr'g Ex. DF86.)  Lebron took notes of this interview with Singh, but later destroyed the notes after incorporating them into a report. (N.T. 1/31/08, at 28-29, 32).  At the time of the interview, Lebron considered Singh's allegations to

_____

[2]During the January 31, 2008 hearing, we invited Fleet to cite authority to the contrary, and it was unable to do so.  (N.T. 1/31/08, at 52.)

be allegations of criminal wrongdoing, which are matters that CBP does not ordinarily handle.  (Id. at 22.)  He therefore called in the Coast Guard to investigate further.  (Id. at 21-22.)

"Five or so" Coast Guard officers, including Chief Warrant Officer John Nay and Coast Guard Chief Marine Science Technician Matthew Jones, joined Lebron and his two colleagues at the Terminal, and all eight individuals boarded the Ship.  (Id. at 23-24.)  Lebron went with Nay and Jones to the engine room of the Ship (id. at 25), because, according to Nay, they wanted to get down to the engine room to make sure that log books pertaining to discharges and the alleged discharge hose were still in place.  (N.T. 1/30/08, at 98-99.)  On the way to the engine room, Singh pointed out one log book in the control room (N.T. 1/31/08, at 33), and, in the engine room, he showed Nay, Jones and Lebron the alleged discharge hose, which Nay seized and put into his car.  (N.T. 1/30/08 at 58, 96.)

According to Jones, upon finding the hose, they realized that "there was possibly something going on here."  (Id. at 157.)  He therefore located the Second Engineer on watch, who was Alokesh Dhabal, and asked him questions about the hose and certain oil pollution control equipment on the Ship.  (Id. at 158.)  He also asked for Dhabal's help in taking oil samples from various places in the engine room.  (Id.)   Because it was too loud in the engine room to talk easily, Jones and Dhabal moved to the engine control room, where they talked in a conversational manner, with people coming and going.  (Id. at 159.)  According to Jones, Dhabal also offered to show Jones some of the piping in the engine room, where he thought there might be some oil.  (Id.).

In the meantime, after leaving the engine room, Lebron went to Captain Grewal's cabin, where he met both Grewal and Chief Engineer Dyachenko.  (N.T. 1/31/08, at 26.)  Believing it to be best to detain everyone on board until the Coast Guard was able to interview the crew, Lebron revoked the crew members' shore passes.  (Id. at 31, 35.)  This revocation prevented the crew from leaving

the Ship, but did not affect their ability to move around the Ship.  (Id. at 35.)   Moreover, although

the crew members' passports were collected, CBP did not hold the passports, but rather, left them in

Captain Grewal's care.  (Id. at 34-35.)  Before leaving the Ship, Lebron also talked to Captain Grewal

for "about five minutes" to "get his side of [Mr. Singh's] story."  (Id. at 33.)  He did not take notes

of that interview.  (Id. at 37.)

        When Jones left the engine room, he also went to speak with Captain Grewal in his cabin.

(N.T. 1/30/08, at 161).   Jones told Grewal that the Coast Guard was looking into possible oil

discharges and that he needed to speak to the engineering crew to find out "if they knew anything

about what the hose was used for" and to see if they had any plausible explanations for discrepancies

that the Coast Guard had identified in different waste oil record books.  (Id. at 161, 164.)  Captain

Grewal was accommodating, arranging for the crew members to be available and for two rooms to

be set up in the mess deck area and in the officers' lounge area for the Coast Guard to talk to the crew.

(Id. at 162, 171.)

        CWO Nay and Chief Jones conducted interviews of the crew members in the two rooms.

Jones made the determination as to who would be interviewed and in what order.  (Id. at 255.)  Nay

and Jones first interviewed Gopal Singh together.  (Id. at 63.)  Later, in the officers' lounge, Jones

interviewed Third Engineer Pooran Singh, Motorman Sailor, Second Engineer Dhabal, and Motorman

Vrayan.  (Id. at 175-77, 258-62.)  Coast Guard Ensign Eric Rivera and Brett McKnight, a Special

Agent with Coast Guard Investigative Services ("CGIS"), part of the Coast Guard that conducts

criminal investigations, accompanied Jones for portions of those interviews.  (Id. at 171, 177.)

        In the meantime, Nay conducted interviews of Sharma and Dyachenko in the mess room.  (Id.

at 84-85, 241.)  Nay took notes of all the interviews in which he participated, but he destroyed those

4

notes the next day after writing up a report.  (Id. at 63.)  With him at various times during his interviews were Agent McKnight and Jeffrey Lukowiak, also a Special Agent with CGIS; Agent Jason Burgess from the Environmental Protection Agency; and Chief Jones.  (Id. at 60-62, 102.)  Jones was present for the bulk of Dyachenko's interview, joining the interview shortly after it started, and during the second part of the interview with Sharma, whom they called back to ask more questions after Dyachenko's interview had ended.  (Id. at 180, 182-83, 259-60.)

After the planned interviews had concluded, Grewal came to the officers' lounge, and Jones, Nay and Grewal began "talking about things and it actually just kind of rolled into an interview . . . ."  (Id. at 184-85, 107-08.)  The following day, Jones went back to the Ship to finish up the Port State Control Inspection and went to Grewal's cabin.  (Id. at 189.)  Although there were initially other people in the cabin, including the vessel's P&I lawyers, Jones subsequently found himself alone with Grewal, and Grewal initiated a conversation by asking: "Can I speak to you off the record?"  (Id. at 190.)  According to Jones, Grewal continued talking, although Jones asked him no questions.  (Id. at 190-91.)

## II.    DISCUSSION

As stated above, Defendants challenge the admissibility of the various statements obtained from crew members during the Port State Control Inspection on two bases – the due process clause of the Fourteenth Amendment and the Fifth Amendment right against self-incrimination.

### A.  Due Process

The crux of Defendants' due process argument is that certain statements and Gopal Singh's in-court testimony should be excluded from evidence because two of the interviewers, CWO Nay and Agent Lebron, destroyed their interview notes in violation of the rule set forth in United States v.

Ramos, 27 F.3d 65 (3d Cir. 1994).[3]  All three Defendants also argue that the Government's use of the

statements at trial would violate Defendants' due process rights because the statements were not given

voluntarily.  We reject both of these arguments.

**1.  United States v. Ramos**

Since at least 1977, the rule in this Circuit has been that government agents must preserve

their rough notes of interviews with prospective trial witnesses so that the trial court can determine

whether the notes should be made available to the defendants under either the Jencks Act[4] or Brady

rule.[5]  Ramos, 27 F.3d at 68 (citing United States v. Vella, 562 F.2d 275, 276 (3d Cir. 1977)).  In

Ramos, however, the United States Court of Appeals for the Third Circuit refused to adopt a per se

rule that would automatically preclude evidence based upon destroyed rough notes.  Id. at 68-69.

Rather, the Third Circuit concluded that any destruction of notes should be subject to a good faith test

similar to that employed in cases involving the destruction of evidence, so that only materials

---

[3]Defendants also argue for the suppression of statements obtained in interviews in which Jones participated, asserting that Jones took notes of those interviews and destroyed them.  We find, however, that the evidence does not support a conclusion that Jones took notes, much less that he destroyed notes that he had taken.  To the contrary, Jones credibly testified that he did not take any notes on January 24 or 25, 2007.  (N.T. 1/30/08, at 238-39, 260-61.)  Fleet argues that Jones's report proves to the contrary, because it states that "During [Dyachenko's] interview Mr. Dyachenko continued to get frustrated and was ordering myself and Mr. Burgess to stop writing things down." (Hr'g Ex. DF80.)  However, as Jones reiterated at the hearing when questioned about this portion of his report, he was not taking notes, and  Dyachenko was simply ordering people in general to stop taking notes, and pointing indiscriminately around the room.  (N.T. 1/30/08, at 204.)  We credit Jones's testimony and, therefore, decline to further address Defendants' argument that Ramos demands the suppression of all statements given in Jones's presence.

[4]18 U.S.C. § 3500.

[5]Brady v. Maryland, 373 U.S. 83 (1963).

destroyed in bad faith should be suppressed.[6]  Id. at 69 (stating that "'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law'") (quoting Arizona v. Youngblood, 488 U.S. 51, 57 (1988)).  The Ramos court further stated that in the case of notes allegedly containing Brady material, it "favor[ed] the approach" taken by the Court of Appeals for the Ninth Circuit in United States v. Griffin, 659 F.2d 932 (9th Cir. 1981), that:

> unless [a] defendant is able to raise at least a colorable claim that the investigator's discarded rough notes contained evidence favorable to [him] and material to his claim of innocence . . . - and that such exculpatory evidence has not been included in any formal interview report provided to defendant - no constitutional error of violation of due process will have been established.

27 F.3d at 71 (quoting Griffin, 659 F.2d at 939).  Reading these requirements together, Ramos only demands the exclusion of evidence derived from destroyed rough notes when (1) the destruction was in bad faith, (2) the defendant raises a "colorable claim" that the notes contained either Jencks Act

---

[6]Defendants emphasize that elsewhere in the Ramos opinion, the Third Circuit suggested that negligence on the part of the federal agents might be sufficient to warrant suppression.  See Ramos, 27 F.3d at 72 ("[I]f there were evidence indicating a deliberate or, under circumstances not present here, *even a negligent contravention of the Vella rule*, we would very likely reach a different conclusion.") (emphasis added).  However, the language on which Defendants rely is not only dicta, but is also impossible to reconcile with the Third Circuit's ultimate conclusion that suppression was not warranted in Ramos in part because the law enforcement officers had acted in good faith.  Id. ("In conclusion, because the destroyed notes did not constitute Jencks Act materials, there is nothing beyond speculation to indicate that they contained Brady material, *and the officers clearly acted in good faith in destroying them*, we will affirm the district court's denial of appellants' motion for suppression . . . .") (emphasis added); see also United States v. Ibrocevic, 142 Fed. Appx. 17, 18 (3d Cir. 2005) (stating that where district court found that Government had no obligation to turn  over lost handwritten notes of secret service agent, any error was harmless, in part because there was no evidence that the government acted in bad faith) (citing Ramos).  Accordingly, we reject Defendants' argument that a federal agent's negligence is sufficient to support a suppression order based on the destruction of notes, particularly where, as here, Defendants have also failed to raise a colorable claim that the destroyed notes contained Jencks Act or Brady material.

7

or <u>Brady</u> material, and (3) any excluded material has not been included in any formal interview report provided to the defendant.  <u>Id.</u> at 70-72.

In the instant case, Coast Guard Chief Warrant Officer John Nay took part in the interviews of Dyachenko, Grewal and Gopal Singh (N.T. 1/30/08, at 121-22), and after preparing a written report, destroyed his notes of those interviews.[7]  (<u>Id.</u> at 55, 63.)  Likewise, Agent Lebron took part in an interview of Gopal Singh on the morning of January 24, 2007, took notes of that interview, and destroyed the notes after writing his report.[8]  These facts are undisputed.

Under the circumstances of this case, however, we find that <u>Ramos</u> does not compel the suppression of the statements of Dyachenko, Grewal, or Singh, or the in-court testimony of Singh, for three reasons.  First, we are unable to conclude that either CWO Nay or Agent Lebron acted in bad faith.  Second, we find that Defendants have failed to raise a colorable claim that the destroyed notes actually included either Jencks Act or <u>Brady</u> material.[9]  Third, we find that even if the notes contained

---

[7]Nay also interviewed Sharma, but as stated <u>supra</u> n.1, Sharma's statement is no longer at issue.  Moreover, although he was present when Dhabal made certain statements in the engine room of the Ship, we find that he did not take notes of those statements and, thus, <u>Ramos</u> cannot provide a basis for the suppression of those statements.  (<u>See</u> N.T. 1/30/08, at 130.)

[8]Lebron also briefly interviewed Captain Grewal on the Ship on January 24, 2007, but we find, based on the evidence presented at the hearings, that he took no notes of that interview.  (N.T. 1/31/08, at 37.)  Consequently, contrary to Defendant Grewal's suggestion in his second Motion in Limine to Suppress Statements, there is no <u>Ramos</u> issue arising from that interview.

[9]In this case, as in <u>Ramos</u>, there is really no question that the notes at issue do not contain material that must be produced pursuant to the Jencks Act.  As <u>Ramos</u> explained, the Jencks Act only requires production of "substantially verbatim recitals" of what witnesses said during their proffers, writings that the witnesses signed or otherwise adopted or approved, "substantially verbatim recitals" of anything the Government agents said, or writings that the agents adopted in any way. 27 F.3d at 69-70.  The notes in the instant case, like the notes in <u>Ramos</u>, were not "substantially verbatim" recitals of what the crew members, Nay or Lebron said, and were not signed or otherwise adopted by the crew members, Nay, or Lebron.  Thus, the destroyed notes did not constitute Jencks Act material.

material that should have been disclosed, that material was plainly incorporated into the written reports that were produced.  In reaching these conclusions, which are explained below, we have reviewed the whole record, but primarily rely on Nay's and Lebron's testimony at our January 30-31, 2008 hearing, and CWO Nay's January 23, 2008 affidavit ("Nay Aff.") that was filed with this Court.

### a.    CWO Nay

Nay states in his January 23, 2008 affidavit that he was not the lead investigator on the Ship on January 24, 2007, and that his general practice when he is not the lead investigator is to destroy his notes after preparing his written report.  (Nay Aff.  ¶ 8.)  He further explains that in this case, as is his general practice, his notes consisted mostly of bullet points that did not reflect everything said by the witnesses.  (Id. ¶ 5; N.T. 1/30/08, at 71, 78.)  Moreover, according to Nay, he incorporated all of his notes into his written report, so that there was nothing in his notes that is not reflected in his report. (Nay Aff. ¶ 7.)  He further testified that he destroyed his notes the day after the boarding, after he prepared his report.  (N.T. 1/30/08, at 55, 63.)

Defendants argue that there must have been Brady material in Nay's notes, because other agents' notes and/or reports regarding the same interviews (or subsequent interviews with the same crew members) contain exculpatory material, which is not included in Nay's report, and because Nay has admitted that crew members made some statements in the interviews that do not appear in his report.  However, we credit Nay's testimony, and find as fact, that he incorporated all of his notes into his written report, as was his practice.  (Id. at 113-15, 129.)  We further credit his representation, and find as fact, that he simply did not write down everything that was said in the interviews.[10]  (Id. at 113,

---

[10] Defendants point us to no legal authority that requires agents to write down everything that is said in an interview, and we are aware of no such authority.  Thus, the focus of our Ramos analysis is not on everything that may have been said in the interviews at issue, but rather, is solely on what

Nay Aff. ¶ 5.)

Moreover, there is no evidence that Nay acted in bad faith in destroying his notes, much less that he intentionally destroyed them to erase any record of exculpatory information, and we therefore find that he did not act in bad faith.  As Nay explained, and we find as fact, he did not keep his notes because he simply did not believe that he was required to retain them after memorializing them in his written report, and he was unaware of case law requiring their retention.[11]  (N.T. 1/30/08, at 130-31, 139; Nay Aff. ¶ 8.)  We also fully credit Nay's explicit statement in his sworn affidavit that he "did not destroy [his] notes in an effort to destroy or hide evidence which might have been helpful to the crew members or the companies involved with the [Ship], or unhelpful to the Coast Guard."  (Nay Aff. ¶ 8.)  Finally, it is worth noting that the record establishes that Nay was not the only agent present during the interviews of Dyachenko, Grewal, and Singh.  Rather, Jones accompanied Nay at all three interviews, and Agent Lukowiak and Burgess were also present during Dyachenko's interview.  (N.T. 1/30/08, at 263.)  Defendants therefore have the benefit of other written reports regarding the interviews and statements at issue, and they can use those reports to test the accuracy and completeness of Nay's report.

_____

the agents actually memorialized in their notes.

[11]His belief that he was not required to retain his notes was obviously misguided in light of Ramos.  Nevertheless, we find credible Nay's assertion that he was neither aware of this requirement nor aware of any Coast Guard policy or procedure that required him to either take or retain notes under the circumstances of this case.  Defendants have argued that Volume V of the Coast Guard Marine Safety Manual, which contains policies and procedures for the taking and retention of notes, was applicable to Nay during the January 24-25 Port State Control Inspection.  However, at our April 30, 2008 evidentiary hearing, which was convened to address this precise issue, Coast Guard Captain Michael D. Karr, the Chief of the Office of Vessel Activities, unequivocally testified that there are no Coast Guard policies or procedures regarding the taking or retention of notes in connection with Port State Control Inspections, and that Volume V of the Marine Safety Manual does not apply during such inspections. (N.T. 4/30/08, at 14-17, 24, 26.)

**b.    Agent Lebron**

The record is less well-developed regarding Agent Lebron and his notes, but we nonetheless find that he too did not act in bad faith in destroying his limited interview notes, that Defendants have developed no credible claim that his notes contained either Jencks Act or <u>Brady</u> material, and that to the extent that any such material may have been in the notes, it was incorporated into Lebron's written report.  As Lebron testified at the hearing, and we find as fact, he incorporated <u>all</u> of his notes into his written report and destroyed the notes immediately after preparing the report, because he no longer had any use for them.  (N.T. 1/31/08, at 28, 32.)  Indeed, he testified that if he had <u>not</u> incorporated all of his notes into the report, he would have kept the notes as a record of the conversation, and we fully credit this testimony.  (<u>Id.</u> at 32.)  Lebron further explained that the report of the Singh interview was not a "normal report," for which he might have standard procedures, but rather, was just something he prepared for the file at the Coast Guard's request, and we accept this testimony as fact.  (<u>Id.</u> at 28.)  On this limited record, we cannot find that Lebron acted in bad faith.  Moreover, there is simply no evidence from which we could conclude that there is a credible claim that anything transpired in his interview that would constitute Jencks Act or  <u>Brady</u> material, much less that any such material was in the destroyed notes.

In declining to suppress the above statements to Nay and Lebron, we acknowledge the clear message in <u>Ramos</u> that the Third Circuit frowns upon the destruction of notes by law enforcement officers.  Notwithstanding, <u>Ramos</u> did not establish a per se rule, and only demands suppression of statements based upon the destruction of notes when the law enforcement officer has acted in bad faith.  Here, we cannot conclude based on the evidence presented that either Nay or Lebron destroyed their notes to preclude the dissemination of exculpatory statements that appeared in the notes or to

obstruct justice in some other way.   Rather, we find both Nay and Lebron credible in their explanations as to why they destroyed their notes and their representations that the full content of their notes was included in their reports.   Under all of the above circumstances, we find that <u>Ramos</u> does not require the suppression of the statements of Dyachenko, Grewal or Gopal Singh, or the in-court testimony of Singh.   Defendants' motions in that regard are therefore denied.

### 2. <u>Voluntariness</u>

Defendants Fleet and Grewal also argue that the statements given by crew members on the Ship should be suppressed under the due process clause of the Fourteenth Amendment because they were not made voluntarily.   "A statement is given voluntarily if, when viewed in the totality of the circumstances, it is the product of an essentially free and unconstrained choice by its maker." <u>United States v. Jacobs</u>, 431 F.3d 99, 108 (3d Cir. 2005) (citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225 (1973), and <u>United State v. Swint</u>, 15 F.3d 286, 289 (3d Cir. 1994)).   Significantly, however, "coercive police activity is a necessary predicate to the finding that a [statement] is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986).   Ultimately, the burden of proving that a challenged statement was voluntary is on the Government.   <u>Jacobs</u>, 431 F.3d at 108-09 (citing <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972)).   The burden of proof is preponderance of the evidence.   <u>Connelly</u>, 479 U.S. at 169 (stating that "as we held in <u>Lego v. Twomey</u>, . . . the voluntariness of a confession need be established only by a preponderance of the evidence . . . .").

The Government asserts that the statements at issue were voluntary, and that there was no "coercive police activity."   The record establishes that the Coast Guard boarded the Ship in response to the allegation by Gopal Singh that waste oil had been discharged into the ocean during the Ship's

voyage to Philadelphia.   The evidence conclusively establishes that the resulting investigation was a Non-Priority Vessel Port State Control Inspection, which is a routine civil inspection that, in this case, included specific inquiries into the allegations of waste oil discharge.[12]  (N.T. 1/30/08, at 150.) Indeed, as Chief Jones testified at the hearing, we find that one aspect of a Port State Control Inspection is the investigation of suspected violations of MARPOL, a set of international regulations that addresses oil pollution, among other matters.  (Id. at 146-48.)  As the evidence establishes is usual in Port State Control Inspections, the Coast Guard inspectors spoke with members of the crew, asking questions about things that they did not understand.  (Id. at 152-53.)  While Chief Jones and his team summoned various crew members to one of two rooms on the Ship to answer questions

---

[12]Port State Control Inspections are conducted pursuant to 14 U.S.C. § 89(a), which provides in part as follows:

> The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States.  For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance.

14 U.S.C. § 89(a)

Jones explained at the hearing that a Port State Control Inspection has two components, a safety inspection and a security inspection.  (N.T. 1/30/08, at 146.)  For the safety component, the Coast Guard checks to see that the vessel is seaworthy and safe, and in compliance with U.S. and International laws and regulations.  (Id.)  This inspection includes inspection of the vessel's documentation, crew licenses, navigation and lifesaving equipment, and pollution control equipment. (Id. at 146-48.)  For the security component, the Coast Guard makes sure that the vessel is in compliance with security regulations that were implemented in 2004, which require all foreign vessels to have a security program in place, and that the ship's crew is implementing those security measures on board the ship.  (Id. at 147.)  According to Jones, Port State Control Inspections are in many ways standardized, but each inspection is also unique, as the inspectors follow up on specific things that attract their attention.  (Id. at 160.)  In the case of the January 24, 2007 inspection, the Coast Guard expanded its inspection regarding oil pollution, "asking for more documentation, testing more equipment and going into it deeper than [they] normally would."  (Id. at 256.)

13

regarding the alleged overboard discharge of oil, we find based on the evidence submitted that the interviews were not coercive.  As the record makes clear, the investigators simply asked questions and the individuals voluntarily answered them.  Furthermore, the credible hearing testimony of the Government witnesses was, and we find as fact, that the interviews were professional and conversational, with no yelling or hostility, and that the interviewees were free to leave their interviews if they desired  (Id. at 123-24, 126, 172-174.)

Fleet and Grewal make a variety of factual assertions in support of their argument that the statements at issue were made involuntarily and as a result of "coercive police activity."  Most notably, they assert that the Coast Guard's investigation, although under the guise of a routine Port State Control Inspection, was actually a criminal investigation that took advantage of the Coast Guard's statutory powers to conduct Port State Control Inspections; that the vessel's P&I counsel, who was on the Ship during the interviews, was excluded from the interviews in spite of the interviews' criminal focus; that the interviewed crew members did not speak fluent English; and that Coast Guard Special Agent Jeff Lukowiak lied to Sharma in an attempt to elicit incriminating information.

The record does not support the contention that the Coast Guard overstepped the boundaries of its statutory powers to conduct civil Port State Control Inspections by coercively extracting statements from the crew members to advance a criminal case.  Fleet and Grewal point to the fact that CGIS inspectors were called to the Ship, that those inspectors as well as the CBP inspectors carried guns and handcuffs, and that the investigation very quickly gave rise to criminal charges.  However, we find that the questioning of the crew members here was consistent with the Coast Guard's customary civil investigation of MARPOL violations in the context of Port State Control Inspections,

and we will not find otherwise merely because the Federal Rules of Evidence may permit the use of

the statements in a criminal case.[13]   Moreover, while Defendants contend that the interviews were

clearly part of a criminal investigation as the CGIS and CBP agents carried handcuffs and/or guns,

the evidence at the hearing, which we credit, was that none of the Coast Guard inspectors who

initially boarded the Ship to commence the inspection, including Chief Jones, who directed the

inspection, were criminal investigators, and none carried guns or handcuffs.  (N.T. 1/30/08, at 154-

55.)  We also find that no CBP agents were present for the afternoon interviews, and the participation

of CGIS agents was minimal.[14]   Furthermore, the hearing testimony was clear that no one, CGIS

---

[13]Defendants contend that the investigation was plainly criminal as a Coast Guard e-mail designated it as such.  Specifically, Defendants introduced into evidence at the hearing an e-mail that was sent at 11:50 a.m. on January 24, 2007 from the Coast Guard's D-5 District, the portion of the Coast Guard that Jones testified makes decisions as to whether a matter is "going criminal."  (Hr'g Ex. DF91; N.T. 1/30/08, at 196.)  The Subject Line of the e-mail states "IMPORTANT MARPOL VIOLATION/ENVIRONMENTAL CRIME - M/V VALPARAISO STAR."  (Hr'g Ex. DF91.) However, we find that Jones was not aware of this email, and remained the lead inspector for the January 24, 2007 inspection after the email was sent.  Moreover, he did not know, even at the January 30, 2008 hearing, when command referred the case to the U.S. Attorney's office, transforming it into a criminal matter.  (N.T. 1/30/08, at 252-53.)  Accordingly, we conclude that in spite of this email and CGIS's presence on the Ship on the afternoon of January 25, 2007, the investigation remained a civil investigation.  Moreover, even assuming solely for the sake of argument that the investigation became a criminal investigation sometime during the afternoon of January 24, 2007, rendering the activity "police activity," the fact remains that the activity at issue was not "coercive" and, thus, the crew members' statements were voluntary.

[14]The testimony at the hearing, which we credit and accept as fact, was that CGIS Special Agents McKnight and Lukowiak  were present at the interviews merely to assist with the Port State Control Inspection, and for "moral support."  (N.T. 1/30/08 at 120-21,166.)  Jones was not certain who called for CGIS to assist them, but said that the Coast Guard had been briefing command as to what they were doing, and he assumed that command summoned CGIS.  (Id. at 166.).  In any event, Jones asked most of the questions in the interviews in which he was involved, because he was the lead inspector and had "most of the pieces of the puzzle" from having been in the engine room.  (Id. at 167.)  While CGIS did ask some questions, Jones characterized their questioning as "minimal." (Id. at 166.)  Indeed, he did not recall Agent McKnight asking any questions at all.  (Id. at 257-58.) Jones further explained that, in spite of the presence of CGIS agents, the inspection "continued on just the same as it would have if they hadn't been there."  (Id. at 168, 187.)

agents included, threatened the crew members with handcuffs or guns.[15]

Furthermore, the fact that a lawyer was on board the Ship and excluded from the interviews does not support a conclusion that the Coast Guard was engaged in coercive activity in this case. The parties stipulated at the hearing that Richard Tweedie, the P&I lawyer who was on the Ship on January 24, had only been appointed to represent the "vessel" at the time of the interviews, and his firm was not hired to represent Fleet until the next day (at the earliest). (N.T. 1/31/08, at 43.) Thus, we can only conclude that Mr. Tweedie did not represent Fleet or the crew members at the time of the interviews, so that his exclusion from the interviews did not constitute exclusion of Defendants' counsel.

Moreover, despite Defendants' claim that the crew members did not speak fluent English, we note that CWO Nay and Chief Jones both credibly testified at the hearing that they could communicate effectively with all of the crew members that they interviewed, with the exception of Sailor, whom, as a result, they did not really interview. (N.T. 1/30/08, at 127, 176-77.) Thus, we find that there was no language barrier that rendered the interviews coercive. Finally, we see no relevance to the fact that Agent Lukowiak may have lied to Sharma in the course of his interview, when Sharma's statement is no longer at issue in this motion.

For the foregoing reasons, we reject Fleet's and Grewal's argument that due process requires the statements to be suppressed because the statements were not made voluntarily. To the contrary,

---

[15]Fleet contends that at least one crew member was threatened with handcuffs and that another was told that he would be thrown in jail if he did not tell the truth, and it has submitted Rule 15 deposition testimony to that effect. (See, e.g., P. Singh Dep. and Sailor Dep.) However, these allegations are simply inconsistent with the credible hearing testimony of Nay and Jones that the interviews were professional and conversational and that the investigators did not threaten the crew members in any way. (N.T. 1/30/08, at 123 (Nay), 174 (Jones).)

we find that the Government has established by a preponderance of the evidence that the statements at issue were made voluntarily and not as the result of coercive police activity.

**B. <u>Fifth Amendment - Right to Miranda Warnings</u>**

Defendants Dyachenko and Grewal also argue that their statements should be suppressed based on the Fifth Amendment, because they were not given <u>Miranda</u> warnings.  In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court held that a person who is subject to "custodial interrogation" must "be warned that he has a right to remain silent, that any statement that he does make may be used as evidence against him, and that he has a right to the presence of an attorney . . . ." <u>Id.</u> at 444.  "[I]n determining whether an individual is in custody, the ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>Reinert v. Larkins</u>, 379 F.3d 76, 86 (3d Cir. 2004) (quotation omitted).  "[T]he determination of custody is an objective inquiry (that is, what a reasonable person would believe) based on the circumstances of the interrogation." <u>Jacobs</u>, 431 F.3d at 105 (citing <u>United States v. Leese</u>, 176 F.3d 740, 743 (1999)).  As a general matter, "the Coast Guard's routine stop, boarding, and inspection of a vessel on the high seas is not considered 'custodial.'" <u>United States v. Li</u>, 206 F.3d 78, 83 (1st Cir. 2000) (citations omitted).

The court may consider the following factors in determining whether an individual was in custody:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics, such as hostile tones of voice, display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

17

United States v. Williams, 437 F.3d 354, 359-60 (3d Cir. 2006) (citations omitted).  Courts may also consider "information known by the officer concerning the suspect's culpability," and "whether the officer revealed his or her belief that the suspect was guilty."  Jacobs, 431 F.3d at 105 (citations omitted).  Upon consideration of all of these factors, as well as the other circumstances of the questioning, we conclude that neither Dyachenko nor Grewal was in custody at the time they were questioned.

>    1.    **Dyachenko**

The only evidence regarding the circumstances of Dyachenko's questioning was provided by the Government, as Dyachenko chose not to testify at the hearing.  Dyachenko was apparently summoned to the officers' mess room by the Coast Guard with the assistance of Captain Grewal.  Four individuals were present at the interview – Chief Jones, CWO Nay, EPA Agent Burgess and CGIS Agent Lukowiak.  As Nay testified, Dyachenko stated at the beginning of the interview that his heart hurt and that he needed an interpreter, but he nevertheless stated that he was fine to continue with the interview.  (N.T. 1/30/08, at 75, 103-04; see also Burgess Rpt. ("Dyachenko stated he would stop the interview if he failed to understand any questions, felt confused, or had trouble comprehending the questions in English.  Dyachenko said that if he had trouble understanding English, he would want to perform the interview though an interpreter, but at this time he wanted to proceed."))  Moreover, the agents told Dyachenko at the outset that if he felt like he needed to stop, they would stop.  (N.T. 1/30/08, at 104.)  As Nay testified, from the start of the interview, Dyachenko was standoffish, and appeared angry and annoyed as the interview proceeded.  (Id. at 126.)  Indeed, both Nay and Jones indicated that at one point, Dyachenko told the agents to stop taking notes, saying that he did not want anything written down.  (Id. at 126-27; Hr'g Ex. DF80, at 5.)  Significantly,

Dyachenko ultimately left the interview on his own volition, refusing to answer any more questions. (Id. at 126.)  He also refused to give Jones a notebook that he was carrying in his pocket, which contained information about waste oil tank levels.  (Id. at 182.)

Dyachenko argues in his brief that the inspection that the Coast Guard conducted in this case was far from a  "routine" inspection, and that he was in custody during his interview.  In support of this argument, he first notes that he was summoned for questioning after the Coast Guard received a "hot tip from a disgruntled former employee" that oil had been dumped from the Ship and that Dyachenko had been involved.  (Dyachenko Br. at 12.)  Second, he concedes that he left the interview, but argues that there was no indication that he was free to leave during the heart of the interrogation.  Third, he notes that he was not told at the outset of the interview either that he was not under arrest or that he was the target of an investigation and thus, he implies, he could not make an informed decision as to whether or not to provide information.  Finally, he contends in his brief that (1) the investigators asked confrontational and intimidating questions; (2) he was confronted with the oil record book and sounding book and asked to explain them; (3) Chief Jones threatened him with criminal sanctions for impeding an investigation if he did not turn over his personal property; and (4) in the end, in ill health and without an interpreter, he remained for questioning "out of fear of reprisal for non-compliance and potentially impeding a [United States Coast Guard] investigation."  (Id.)

In many respects, Dyachenko's characterization of the questioning has no support in the record.  Most notably, the undisputed hearing testimony was that the tone of his interview, like all of the interviews that day, was professional, and the investigators did not use hostile tones or raised voices.  Although Dyachenko was, in fact, shown the Ship's books and questioned about them, CWO Nay credibly testified that the sole purpose of the interviews was simply to determine whether there

19

had been discharges from the Ship and, if so, who knew about them. (N.T. 1/30/08 at 95, 103.) Jones specifically explained, and we credit, that he showed Dyachenko the books because "he had questions as [to] why tank levels had dropped and why they didn't match up with what the tank sounding log was reflecting and to see if there was any explanation for those drops." (Id. at 182.) As Jones testified, the aim of the investigation was to find out if there had been any regulatory violations on the Ship. (Id. at 162-63.) Furthermore, contrary to Dyachenko's assertion, the evidence is not that Jones threatened Dyachenko with criminal sanctions, but only that Jones told him in the engine room after the interview was over that Dyachenko would be impeding a Coast Guard investigation if he did not provide them with his diaries.[16] (See Hr'g Ex. DG3.) Finally, while Dyachenko argues that there was no indication that he was free to leave during the heart of the questioning, there is no evidence that he was not free to leave during that time. Moreover, the fact that he did leave the interview before the questioning concluded certainly supports a finding that he was free to leave at any time.

Upon consideration of all of the factors and the record evidence before us, we find that Dyachenko was not in custody when he was questioned in the officers' mess room. As his counsel conceded at the hearing, Dyachenko was never told that he was under arrest. (N.T. 1/31/08, at 67.) The location of the interview, i.e., the officers' mess room on the Ship, was not an inherently coercive environment. While there is no conclusive evidence as to the length of Mr. Dyachanko's questioning, we know that he ended the interview when he chose to end it by walking out. (See id. at 68.) There is also no evidence that any coercive tactics were used in his interview, and there is ample evidence to the contrary. In addition, Dyachenko's counsel conceded that his client was not physically

---

[16] The Coast Guard had the authority to seize the diaries pursuant to 14 U.S.C. § 89(a). See supra n.12.

restrained.  (Id.)  Finally, it is apparent from the evidence that Dyachenko voluntarily submitted to the limited questioning for which he stayed, and left when he no longer wanted to cooperate.  Moreover, although the investigators had obtained information from a crew member prior to the interview that Dyachenko was involved in dumping oil overboard, there is no evidence that they believed Dyachenko to be guilty of criminal conduct, much less that they revealed that belief to Dyachenko.  Accordingly, under the multi-factor test set forth above, we conclude that the majority of factors favor a finding that Dyachenko was not in custody and that he therefore had no right to Miranda warnings.  Dyachenko's request that we suppress his statements as violative of the Fifth Amendment is therefore denied.

### 2. Grewal

As with Dyachenko, the only evidence of the circumstances of Grewal's questioning was provided by Government witnesses, because Grewal did not testify at the hearing.  As stated above, Chief Jones testified that shortly after arriving on the Ship, he went to Grewal's cabin, and told Grewal that the Coast Guard was looking into possible oil discharges and needed to talk to crew members.  (N.T. 1/30/08, at 161-62.)  According to Jones, Grewal was very accommodating, helping to find the crew members and secure their presence for interviews.  (Id. at 162.)  Moreover, towards the end of the day, Grewal came on his own accord to the officers' lounge.  (Id. at 240.)  According to Nay, he and Jones questioned Grewal informally in the lounge, standing up, with other people coming and going.  (Id. at 107-08.)  In addition, Jones testified that the door was open during this informal interview with Grewal, and that Grewal spoke perfect English, seemed very intelligent, and had a calm demeanor.  (Id. at 186.)  The next day, Jones testified, he was in the Master's Chambers reviewing documents, when Grewal initiated another conversation.  (Id. at 190.)

21

Grewal argues in his motion that he was plainly under arrest and not free to leave during the interviews because CBP had seized all of the crew members' passports. Although CBP Agent Lebron testified at the hearing and confirmed the seizure of the passports, that fact is far from determinative of the custody issue. Indeed, other testimony at the hearing was that the crew, although confined to the Ship as a whole, was not confined to any particular portion of the Ship, but rather was free to move around the Ship. (Id. at 160, 170-71; N.T. 1/31/08, at 35.) Moreover, applicable case law supports the Government's assertion that the Coast Guard's confinement of crew to a ship during an investigation does not constitute custody for Miranda purposes, even when criminal conduct is suspected. See, e.g., United States v. Rioseco, 845 F.2d 299, 303 (11th Cir. 1988) ("The mere fact that Coast Guard officers were armed and that [Ship] personnel were gathered in one specific area of the boat . . . subsequent to boarding could not lead a reasonable man to believe he was in custody.")

Grewal also argues in his motion that the location and physical surroundings of his first interview in the officers' lounge suggested that he was in custody as the size of the room and the number of investigators meant that the investigators were "undoubtedly . . . blocking" the exits during the first interview. However, as stated above, Nay credibly testified, and we find as fact, that people were coming and going during the questioning, so that the exits plainly were not blocked. Furthermore, there is credible evidence that during at least part of the officers' lounge interview, Grewal, Nay and Jones were standing up and talking informally, demonstrating that the location and physical surroundings were far from intimidating. Grewal also argues that the conditions were coercive because certain inspectors in the room had guns and handcuffs, but as stated repeatedly above, we credit the only hearing testimony on this topic, which was that although the CGIS and CBP agents may have carried guns and/or handcuffs, no agent threatened any crew member with either

guns or handcuffs during the interviews.  (N.T. 1/30/08, at 123-24, 172, 174.)

Grewal finally asserts in his motion that he did not voluntarily submit to questioning, noting that immediately prior to his questioning, Jones had asked him to help the Coast Guard to get the diary that Dyachenko had refused to turn over.[17]  (Id. at 182.)  He argues that given this fact, no reasonable person in his circumstances would have believed that his submission to interrogation was voluntary.  We disagree.  Regardless of how Grewal may have felt upon hearing the Coast Guard's reaction to Dyachenko's insubordination,[18] the fact remains that the Coast Guard did not seek out Grewal for a formal interview, but rather, Grewal came to them and a conversation naturally developed.  (Id. at 184-85, 107-08.)  Having initiated that contact, Grewal cannot credibly argue that he involuntarily submitted to the conversational questioning that followed.  Instead, it seems plain that he voluntarily presented himself to the investigators as an informational resource.[19]  Finally, we

---

[17]Jones testified that after Dyachenko's interview, he went to Grewal and explained that Dyachenko had refused to give them a notebook that he had and that Jones needed that notebook and any others that the Ship might have.  (N.T. 1/30/08, at 182.)  According to Jones, Grewal talked to Dyachenko and "after that [Dyachenko] was very cooperative, gave up the notebooks and anything else [Jones] needed."  (Id.)

[18]Indeed, it seems just as likely that having heard of Dyachenko's refusal to turn over the diaries, a reasonable person in Grewal's position would have felt emboldened to follow Dyachenko's lead and refuse to cooperate with the investigation in any way.

[19]CGI Agent Horoszewski authored a report in which he stated that he was present during this interview, and that Grewal "was repeatedly told his rights to an attorney and that if it was found that he was lying that he could be brought up for charges on account of impeding a Coast Guard investigation."  (Hr'g Ex. DG3.)  This statement is troubling in that it characterizes the interaction with Grewal in a way that is inconsistent with the hearing testimony regarding the same interview.  However, whether we credit or discredit this excerpt from Horoszewski's report, our determination that Grewal has not established a Fifth Amendment violation would not change.  Indeed, if we were to credit the whole excerpt, we would be forced to find no Fifth Amendment violation because Grewal was advised of his right to counsel.  On the other hand, if we were to discredit the whole excerpt, the assertion that Grewal was told that he would be "brought up for charges" would not factor into our analysis.  We certainly will not randomly credit one portion of the excerpt and

note that in Grewal's case, there is no evidence that agents were motivated to question him because they had information suggesting Grewal's culpability in the oil dumping or that any agent communicated to him that they believed him to be guilty of dumping oil himself.

Upon consideration of all of the above circumstances, and the testimony presented during the January 30-31 and April 30, 2008 hearings, we conclude that Grewal was not in custody when he was questioned on January 24 and 25, 2007, but rather, voluntarily submitted to the professional questioning of Coast Guard agents and cooperated with their investigation, as one would expect of a reasonable person in the Captain's position.  We therefore find that he was not entitled to <u>Miranda</u> warnings and we will not suppress his statements because he did not receive such warnings.

## III.    CONCLUSION

In sum, we find that Defendants have established no basis on which to suppress and/or exclude any of the January 24 or 25, 2007 statements of crew members on the Ship or Gopal Singh's in-court testimony.  Rather, based on the facts developed at the hearings held on January 30-31 and April 30, 2008, we find that proper use of the statements and Gopal Singh's testimony will not violate due process and that the taking of the statements did not violate Dyachenko's or Grewal's Fifth Amendment rights.  Defendants' various Motions to Suppress and/or Exclude the Statements are therefore denied.

An appropriate Order follows.

_____

discredit the other without any reasoned basis to do so.   Accordingly, this excerpt simply does not affect our ultimate determination that Grewal has not established a Fifth Amendment violation.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :      CRIMINAL ACTION
     :
         v.      :
     :
FLEET MANAGEMENT LTD., ET AL.      :      NO. 07-279

## ORDER

**AND NOW,** this 7th day of May, 2008, upon consideration of Defendant Fleet's Motion in Limine to Exclude Statements Taken by Government (Docket No. 170), the Motion in Limine on Behalf of Dyachenko to Suppress Certain Statements (Docket No. 169), Defendant Parag Grewal's two Motions in Limine to Exclude Statements Taken by Government (Docket Nos. 177 and 222), "Defendants' Joint Motion in Limine to Exclude Out-of-Court Statements by Dhabal and Gopal Singh and In-Court Testimony of Gopal Singh" (Docket No. 217), all documents submitted in connection therewith, the hearings held on those Motions on January 30-31 and April 30, 2008, and the oral argument held on March 10, 2008, **IT IS HEREBY ORDERED** that the Motions are **DENIED**.

BY THE COURT:

/s/ John R. Padova, J.
John R. Padova, J.